AB:JPM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – –– – – –X

UNITED STATES OF AMERICA

      - against -

BENG SUN KOH,

             Defendant.

– – – – – – – – – – – – –– – – X

AFFIDAVIT IN SUPPORT OF
REMOVAL TO THE
DISTRICT OF COLUMBIA

(Fed. R. Crim. P. 5)

No. 19-MJ-006

EASTERN DISTRICT OF NEW YORK, SS:

        ZACHARY HATCHER, being duly sworn, deposes and states that he is a

Special Agent with the United States Department of Defense, Defense Criminal

Investigation Service ("DCIS"), duly appointed according to law and acting as such.

        Upon information and belief, on or about January 2, 2019, a warrant for the

arrest of the defendant BENG SUN KOH, was issued by the United States District Court for

the District of Columbia, in connection with an indictment charging the defendant with

conspiracy to unlawfully export U.S.-origin goods to Iran and to defraud the United States,

in violation of Title 18, United States Code, Section 371, Title 50, United States Code,

Section 1705, and pertinent regulations.

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     On or about January 2, 2019, the defendant BENG SUN KOH was charged by indictment in the United States District Court for the District of Columbia with conspiracy to unlawfully export U.S.-origin goods to Iran and to defraud the United States, in violation of Title 18, United States Code, Section 371, Title 50, United States Code, Section 1705, and pertinent regulations.  An arrest warrant for KOH was issued, a true and correct copy of which is attached hereto as Exhibit A.

2.     On January 2, 2019, the defendant BENG SUN KOH arrived at John F. Kennedy International Airport in Queens, New York, aboard an international flight. Upon his arrival, the defendant was stopped for questioning by a U.S. Customs and Border Protection ("CBP") officer who identified the defendant based on a photograph of the individual who was wanted in the District of Columbia.  The defendant presented a Singaporean passport to the CBP officer with the name "Michael Koh Beng Sun."

3.     A CBP officer directed the defendant BENG SUN KOH to the secondary screening area where the defendant was interviewed by law enforcement officers. During that interview, the defendant identified himself as "Beng Sun Koh" and indicated he also used the name "Michael."

4.     I have compared a photograph of the individual wanted in the District of Columbia, based on that person's visa application to the United States, with the likeness

---

[1]     Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause for removal, I have not described all the relevant facts and circumstances of which I am aware.

2

of the defendant and confirmed it is the same individual.  During a baggage inspection by

CBP, law enforcement officers also found documents pertaining to the same visa application

in the defendant's luggage.

WHEREFORE, your deponent respectfully requests that the defendant BENG

SUN KOH be removed to the District of Columbia so that he may be dealt with according to

law.

ZACHARY HATCHER
Special Agent
DCIS

Sworn to before me this
3rd day of January, 2019

/s/ PK

THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

3

# EXHIBIT A

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | Case: 1:19-cr-00002 |
| v. | ) | Assigned To : Judge Rudolph Contreras |
| BENG SUN KOH | ) | Assign. Date : 01/02/2019 |
| Also known as, | ) | Description: INDICTMENT (B) |
| MICHEAL KOH | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     BENG SUN KOH, also known as Micheal Koh                              ,

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment       ☐ Superseding Indictment       ☐ Information       ☐ Superseding Information       ☐ Complaint
☐ Probation Violation Petition       ☐ Supervised Release Violation Petition       ☐ Violation Notice       ☐ Order of the Court

This offense is briefly described as follows:

50 U.S.C. §1705 (International Emergency Economic Powers Act) ;
31 C.F.R Part 560 (Iranian Transactions and Sanctions Regulations);
18 U.S.C. 371 (Conspiracy)

Date:   01/02/2019

_____
*Issuing officer's signature*

City and state:   Washington, D.C.

United States Magistrate Judge Deborah A. Robinson
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ |
| at *(city and state)* ~~U. S. District and Bankruptcy Courts~~ |

Date: _____

~~for the District of Columbia~~
A TRUE COPY
ANGELA D. CAESAR, Clerk

By _____
Deputy Clerk

_____
*Arresting officer's signature*

_____
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on July 9, 2018**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| | : | **Grand Jury Original** |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| | : | |
| | : | **18 U.S.C. § 371** |
| **BENG SUN KOH,** | : | **(Conspiracy)** |
|     **Also known as** | : | |
|     **MICHEAL KOH,** | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency Economic** |
| **Defendant.** | : |   **Powers Act)** |
| | : | |
| | : | **31 C.F.R. Part 560** |
| | | **(Iranian Transactions and Sanctions** |
| | | **Regulations)** |

Case: 1:19−cr−00002
Assigned To : Judge Rudolph Contreras
Assign. Date : 01/02/2019
Description: INDICTMENT (B)

**FORFEITURE:**
**18 U.S.C. § 981(a)(1)(c)**
**28 U.S.C. § 2461(c)**

**(Criminal Forfeiture)**

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

**(Conspiracy to Unlawfully Export U.S.-Origin Goods to Iran**
**and to Defraud the United States)**

At all times material to this Indictment:

U.S. District and Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk

By_____
Deputy Clerk

1

## The Defendant and Other Individuals and Entities

1. Defendant BENG SUN KOH, also known as MICHEAL KOH (hereinafter, "KOH"), was a citizen of Singapore. KOH owned multiple businesses, including KOH COMPANY 1, located in Ho Chi Minh City, Vietnam, and KOH COMPANY 2, located in Singapore.

2. PERSON 1 was an Iranian National.   PERSON 1 owned COMPANY 3 located in Tehran, Iran.

3. PERSON 2 was the managing director of COMPANY 5.

4. PERSON 3 was an employee of COMPANY 5.

5. PERSON 4 was an Iranian national.   PERSON 4 used email addresses associated with COMPANY 10, an Iranian laboratory equipment supplier, and COMPANY 11, an Iranian importer of laboratory equipment.

6. KOH COMPANY 1 was located in Ho Chi Minh City, Vietnam, and owned by KOH.

7. KOH COMPANY 2 was located in Singapore and owned by KOH.

8. COMPANY 3, located in Tehran, Iran, was owned by PERSON 1.

9. COMPANY 4 was a U.S. manufacturing company with headquarters in Massachusetts.

10. COMPANY 5 was an authorized distributor for COMPANY 4 products located in Hanoi, Vietnam.

11. COMPANY 6 was a trading and freight forwarding company located in Dubai, United Arab Emirates.

12. COMPANY 7 was a trading company located in Dubai, United Arab Emirates.

13. COMPANY 8 was a trading company located in Dubai, United Arab Emirates.

14. COMPANY 9 was an Iranian distribution company located in Tehran, Iran.

15. COMPANY 10 was an Iranian laboratory equipment supplier at which PERSON 4 worked.

16. COMPANY 11 was an Iranian importer of laboratory equipment at which PERSON 4 worked.

17. COMPANY 12 was a company located in Hanoi, Vietnam.

18. COMPANY 13 was a freight forwarder in Singapore.

19. COMPANY 14 was a company that acquired part of the COMPANY 4 product line that includes the U.S.-origin Electron Capture Detectors ("ECDs") described below.

20. COMPANY 15 was a freight forwarding company working on behalf of COMPANY 4.

21. Beginning at least in or around January 2014, and continuing through the date of this Indictment, defendant KOH conspired with persons known and unknown to the Grand Jury to procure U.S.-origin products and export those products from the United States to Iran, through Singapore and the United Arab Emirates.

### The International Emergency Economic Powers Act and the Iranian Transactions Regulations

22. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national

3

emergency with respect to that threat.   Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

23. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

24. On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.   The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.   Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, subsequently reissued and renamed the Iranian Transactions and Sanctions Regulations, ("ITSR"), implementing the sanctions imposed by the Executive Orders.

25. The ITSR generally prohibited any person from exporting or causing to be exported from the United States any goods or technology without having first obtained a validated export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which was located in the District of Columbia.   The ITSR were in effect at all times relevant to this Indictment.   The ITSR imposed, among others, the following prohibitions:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

4

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a)     Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .

Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;

Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2)     The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

### Export and Shipping Records

26. Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States.   Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the Department of Homeland Security,

5

Customs and Border Protection, which was headquartered in the District of Columbia.   Electronic Export Information ("EEI") was officially submitted to the Census Bureau, a Department of Commerce agency, through the AES.

27.   An essential and material part of EEI was information concerning the ultimate consignee (commonly known as the "end user") and the country of ultimate destination of the export.   In many cases, the identity and location of the ultimate consignee determined: (a) whether the goods may be exported without any specific authorization from the United States Government; (b) whether the goods may be exported with specific authorization in the form of a license from the United States Department of Commerce, the United States Department of State, or the United States Department of the Treasury; or (c) whether the goods may not be exported from the United States.

28. EEI was equivalent to a statement to the United States Government that the transaction occurred as described.   EEI was used by the United States Bureau of the Census to collect trade statistics and by the United States Department of Commerce, Bureau of Industry and Security, which was located in the District of Columbia, for export control purposes.

## A.   THE CONSPIRACY

29. Beginning at least in or about at least in or about January 2014, and continuing through the date of this Indictment, defendant KOH did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, to: (a) commit an offense against the United States, that is, to export and cause the exportation of goods from the United States to Iran in violation of the prohibitions imposed upon that country by the United States Government, without having first obtained the required licenses from OFAC, located in the District of Columbia, in

violation of Title 50, United States Code, Section 1705 , and Title 31, Code of Federal Regulations, Parts 560.203, 560.204 and 560.205 (ITSR); and (b) defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to Iran without having first obtained the required licenses from OFAC, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

30. KOH had an ongoing business relationship with PERSON 1, who KOH knew was an Iranian national, and who was associated with COMPANY 3, a company in Tehran, Iran.   This relationship produced at least one million USD in transactions between KOH and PERSON 1 from in or about 2011 to in or about 2013.   Beginning in at least January 2014, PERSON 1 would supply KOH with orders for various products, including U.S.-origin goods manufactured by COMPANY 4.   COMPANY 4 maintained an authorized reseller, COMPANY 5, in Vietnam. KOH would arrange with COMPANY 5 to have COMPANY 4's products shipped to Singapore. KOH would attempt to hide the true location and nature of the end users, stating that the end users were in Vietnam, when in fact the goods were to go to Singapore and on to the United Arab Emirates, and then transshipped for PERSON 1 to Iran.   KOH would solicit the assistance of other conspirators to provide answers on end use certificates that would pass muster with COMPANY 4, knowing that the products were destined for another location.

31. The conduct alleged in this Count occurred within the District of Columbia and elsewhere and is therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a) and 3238.

## B. OBJECTS OF THE CONSPIRACY

32. The objects of the conspiracy were:

     A.     to acquire U.S.-origin goods from the United States in order to supply these goods to entities and end users in Iran;

     B.     to conceal from United States companies and the United States Government that the U.S.-origin goods were destined for Iranian end users;

     C.     to make a financial profit for defendant and other conspirators;

     D.     to evade the regulations, prohibitions, and licensing requirements of IEEPA and the ITSR.

## C. MANNER AND MEANS OF THE CONSPIRACY

33.     The manner and means by which defendant and other conspirators sought to accomplish the objects of the conspiracy included, among others, the following manner and means:

     A.     Defendant and other conspirators planned and acted outside the United States to acquire U.S.-origin goods.

     B.     Defendant and other conspirators used e-mail to communicate with one another and with other individuals, including individuals located in the United States, Vietnam, Singapore, United Arab Emirates, and Iran.

     C.     Defendant and other conspirators solicited purchase orders for U.S.-origin goods from companies in the United States for ultimate shipment to Iran.

     D.     Defendant and other conspirators used informal money exchanges and other third parties to change Iranian currency to United States currency, in order to arrange for payment

8

of the U.S.-origin goods.

E.      Defendant and other conspirators intentionally concealed from a company located in the United States, COMPANY 4, and the subsequent acquirer of COMPANY 4's ECDs, COMPANY 14, the true nature of the ultimate end use and the true identities of the ultimate end users of the U.S.-origin goods, by providing false and misleading information about the ultimate end use and end users.

F.      Defendant and other conspirators intentionally caused to be submitted false EEI to the United States Government, concealing from the United States Government the true nature of the ultimate end use and the true identities of the ultimate end users of the U.S.-origin goods.

G.      Defendant and other conspirators caused shipments of U.S.-origin goods to be made from the United States to Singapore and to the United Arab Emirates, for subsequent transshipment to Iran.

H.      Defendant and other conspirators caused the U.S.-origin goods to be exported from the United States to individuals and entities located in Iran through Singapore and the United Arab Emirates without obtaining a license from OFAC, located in the District of Columbia.

### D.   OVERT ACTS

34. In furtherance of the above-described conspiracy, and in order to carry out the object thereof, defendant and others known and unknown to the Grand Jury committed or caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

9

### The Unlawful Export of Five Gas Chromatography Systems

35.  On or about January 13, 2014, PERSON 1 sent KOH an order from COMPANY 3 in Iran for the purchase of five gas chromatography systems manufactured by COMPANY 4 in the United States (hereinafter, the "GC systems").

36. On or about January 14, 2014, KOH sent an email to PERSON 2 at COMPANY 5, requesting a best price quote for five GC systems to be sent to KOH COMPANY 2 in Singapore.

37. On or about January 20, 2014, KOH forwarded to PERSON 1 an invoice for five GC systems in the amount of $88,825 that KOH had modified from the quote received from PERSON 2 at COMPANY 5.  The invoice identified KOH COMPANY 2 in Singapore as the purported seller and COMPANY 6 in the United Arab Emirates as the buyer. The email included a request for a deposit.

38. On or about March 17, 2014, PERSON 1 emailed documentation to KOH reflecting that PERSON 1 had used an intermediary to send $70,002 in United States currency to KOH COMPANY 2's bank account.

39. On or about March 17, 2014, KOH sent PERSON 2 of COMPANY 5 a purchase order for the five GC systems.   The purchase order was from KOH COMPANY 2.

40. On or about March 18, 2014, in response to a request by PERSON 3 of COMPANY 5 that KOH complete an end use certificate, KOH sent PERSON 3 an end use certificate falsely stating that the end user of the five GC systems was KOH COMPANY 1 in Ho Chi Minh City, Vietnam.   No specific end use of the five GC systems was listed.   The end use certificate also falsely certified that the goods would not be reexported, directly or indirectly, in contravention to applicable (re-) export laws and regulations.   The certificate was signed by an employee of KOH

COMPANY 1.

41. On or about March 18, 2014, after PERSON 3 of COMPANY 5 told KOH that KOH needed to also include the specific end use of the five GC systems, KOH emailed PERSON 1 asking what the end use for the five GC systems was, even though KOH had represented that KOH COMPANY 1 was the end user.   KOH advised PERSON 1 that KOH needed to provide that information to COMPANY 4.

42. On or about March 20, 2014, PERSON 1 emailed KOH several possible end uses for the five GC systems.

43.   On or about May 7, 2014, KOH told PERSON 1 that COMPANY 4's five GC systems would be ready for shipment and requested that PERSON 1 make payment.

44.   On or about May 21, 2014, after PERSON 3 of COMPANY 5 emailed KOH that additional information needed to be supplied to COMPANY 4 for the five GC systems, KOH emailed PERSON 3 of COMPANY 5, stating that KOH's alleged government buyer would not provide its name for the end use certificate, and falsely claimed that the installation of the five GC Systems was in Vietnam and that KOH COMPANY 1 would be the end user.

45. On or about June 25, 2014, KOH caused COMPANY 15 to file an EEI Detail Sheet with the United States Department of Commerce that indicated that the five GC Systems had left the United States with an intermediate consignee of KOH COMPANY 2, in Singapore, and, pursuant to information provided by KOH, falsely listed the Ultimate Consignee as COMPANY 12, in Hanoi, Vietnam.

46. On or about June 27, 2014, KOH directed PERSON 3 of COMPANY 5 to have COMPANY 4 deliver the five GC Systems to COMPANY 13 in Singapore.

11

47. On or about July 3, 2014, KOH emailed COMPANY 12, directing that COMPANY 12 send the goods to the United Arab Emirates.   KOH attached two invoices from KOH COMPANY 2 to COMPANY 7 in the United Arab Emirates.   KOH directed that one invoice, which included a total price for the five GC Systems as $88,825, be used in Singapore.   KOH directed that the second invoice, which included a total price for five "[COMPANY 4] MEDICAL CHROMATOGRAPH" as $8,885, be used for customs in the United Arab Emirates.

48. On or about July 5, 2014, KOH directed COMPANY 12 to change the air waybill description of the five GC Systems to "Medical equipment."

49. On or about July 5, 2014, KOH emailed PERSON 1 an air waybill listing the five GC Systems in a group of items labeled "Medical equipment."

50. On or about July 7, 2014, KOH emailed PERSON 1 a commercial invoice for the five GC Systems, now falsely labeled "[COMPANY 4] MEDICAL CHROMATOGRAPH," and a packing list for the same invoice.   Both documents listed KOH COMPANY 2 as the shipper and COMPANY 7 as the receiver.

51. On or about July 16, 2014, COMPANY 7 sent PERSON 1 an invoice on the letterhead of COMPANY 6, which invoice included the five GC Systems.   The Invoice indicated that COMPANY 6 would send the goods to COMPANY 9 in Tehran, Iran.

### The Unlawful Export of Two Electron Capture Detectors

52. On or about July 21, 2014, PERSON 1 emailed KOH, requesting that KOH contact COMPANY 4 in order to obtain two Electron Capture Detectors ("ECDs").

53. On or about July 21, 2014, KOH emailed PERSON 2 at COMPANY 5, requesting a price quote for two ECDs.

54. On or about July 22, 2014, KOH forwarded to PERSON 1 the price quote for the two ECDs that KOH had received from PERSON 2 at COMPANY 5.

55. On or about July 22, 2014, PERSON 1 forwarded this price quote to PERSON 4.

56. On or about July 22, 2014, KOH provided an invoice to PERSON 1 that included an amount of $14,088 for two ECDs.   The invoice was on the letterhead of KOH COMPANY 2, with the items to be sent to COMPANY 6 in the United Arab Emirates.

57. On or about July 22, 2014, PERSON 1 sent KOH an order on the letterhead of COMPANY 3 in Iran, which order included the two ECDs.

58. On or about July 22, 2014, KOH advised PERSON 1 that KOH understood the ECDs were "radioactive products" that could not be shipped by two identified international shipping companies.

59. On or about July 22, 2014, PERSON 1 told KOH that KOH could send the ECDs through one of the identified international shipping companies by falsely claiming the ECDs were medical spare parts and not mentioning the radioactive nature of the items to the shipping company.

60. On or about July 28, 2014, PERSON 1 emailed KOH a remittance form, indicating that an entity was transferring $21,338 in U.S. currency to the bank account of KOH COMPANY 2.   This amount was the same as that listed in prior invoices for multiple items that included the two ECDs.

61. On or about August 6, 2014, PERSON 1 emailed PERSON 4, attaching the invoice described in overt act 56.

62. On or about December 1, 2014, KOH, having become aware that COMPANY 14

13

would be responsible for delivery of the ECDs, emailed this information to PERSON 1.

63. On or about December 1, 2014, PERSON 1 forwarded the information in overt act 62 to PERSON 4.

64. On or about December 29, 2014, KOH misleadingly told PERSON 3 at COMPANY 5 that KOH would use KOH COMPANY 1 as the end user.

65. On or about January 19, 2015, KOH sent PERSON 3 at COMPANY 5 an end use certificate that falsely identified KOH COMPANY 1 in Ho Chi Minh City, Vietnam, as the end user.   The certificate also falsely described the products as "pharmaceutical," and falsely stated that "the products will not be re-sold in or transferred to . . . any U.S. sanctioned or embargoed countries."

66. On or about February 12, 2015, KOH emailed PERSON 3 at COMPANY 5, stating that he needed an air waybill for freight forwarder COMPANY 13.

67. On or about April 16, 2015, KOH emailed PERSON 1 a packing list from COMPANY 14 that included the two ECDs.   The packing list identified the shipping receiver as KOH COMPANY 2 in Singapore.

68. On or about April 16, 2015, PERSON 1 emailed to PERSON 4 the packing list in overt act 67.

69. On or about April 21, 2015, PERSON 1 emailed KOH, stating that the ECDs should be sent to COMPANY 8.   PERSON 1 stated that the total invoice should be for $450 and should describe the goods as "GC Spare parts and don't mention anything about ECD detector." PERSON 1 stated KOH should remove any documents from the cartons and send them to COMPANY 3.   COMPANY 3's signature block included COMPANY 3's address in Tehran,

Iran.

70. On or about April 21, 2015, KOH replied to PERSON 1, stating that he could only send the documents to Dubai, in the United Arab Emirates, not Tehran, in Iran, and requested another address to send the documents.

71. On or about April 22, 2015, PERSON 1 replied to KOH, stating that the documents could be sent to the same address in the United Arab Emirates, referring to Company 8.

72. On or about April 22, 2015, KOH replied to PERSON 1, attaching a commercial invoice from KOH COMPANY 2 for "GC Spare Parts" for a total amount of $450.

73. On or about April 23, 2015, KOH emailed PERSON 1 with the subject line "FW: [International Shipping Company] to Dubai."  KOH stated that he had removed the manual and CDs from the box, and the markings and label on the outside of the box.  KOH attached several photographs, which appeared to be the ECDs, manuals, and packaging.  KOH stated to PERSON 1 that there would be a shipment via the International Shipping Company the next morning.

74. On or about April 27, 2015, after KOH had received information that the shipment had been sent to the United Arab Emirates by the International Shipping Company, KOH forwarded this information by email to PERSON 1.  Two air waybills were attached.  Both listed the recipient as COMPANY 8.  One air waybill was for "Products Manual," and the second was for "GC Spare Parts," with an assigned value of $450.

75. On or about May 5, 2015, KOH emailed PERSON 3 at COMPANY 5 and falsely claimed that KOH was arranging shipment into Vietnam.

**Failure to Obtain Required Licenses**

76. Defendant and other conspirators failed to apply for, receive, and possess, and caused others to fail to apply for, receive, and possess one or more license(s) from OFAC, located in the District of Columbia, to export any of the U.S.-origin goods set forth above from the United States to Iran.

**(Conspiracy to Export U.S. Goods to Iran and to Defraud the United States and the U.S. Department of the Treasury in violation of Title 18, United States Code, Section 371; Title 50, United States Code, Section 1705; and Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205)**

## FORFEITURE ALLEGATION

1. Upon conviction of any of the violations alleged in Count One of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these violations, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendant in an amount of at least $102,913, which represents a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these violations.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

    a. cannot be located upon the exercise of due diligence,

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

16

e. has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(c); and Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

Jessie K. Liu / SM

Attorney of the United States in
and for the District of Columbia

17